CITY OF DULUTH

      Plaintiff,

v.

NATIONAL INDIAN GAMING
COMMISSION, *et al.*

      Defendants.

Civil Action No. 13-246 (CKK)

**MEMORANDUM OPINION**
(December 18, 2013)

Plaintiff City of Duluth ("the City" or "Plaintiff") brings this action against Defendants

the National Indian Gaming Commission and Jonodev Chaudhuri, in his official capacity as the

Acting Chairman of the National Indian Gaming Commission[1] (collectively "Defendants"),

asserting claims under the Administrative Procedure Act. Currently before the Court is

Defendants' [8] Motion to Dismiss. Upon consideration of the pleadings[2], the relevant legal

authorities, and the record as a whole, the Court DENIES Defendants' [8] Motion to Dismiss.

## I. BACKGROUND

### A. Factual Background

The following facts are taken from the Plaintiff's Complaint and must be accepted as true

for purposes of a motion to dismiss. *See Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 681

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Jonodev Chaudhuri has been automatically substituted for Tracie L. Stevens, whom the parties' pleadings name as Defendant.

[2] Compl., ECF No. [1]; Defs.' Mot. to Dismiss, ECF No. [8] ("Defs.' MTD"); Pl.'s Mem. Opp. Defs.' Mot. to Dismiss, ECF No. [9] ("Pl.'s Opp'n."); Reply in Supp. of the United States' Mot. to Dismiss, ECF No. [10] ("Defs.' Reply").

(D.C. Cir. 2009). In 1984, representatives of the City and the Fond du Lac Band of Lake Superior Chippewa ("the Band") began negotiations to explore the creation of a gaming facility within the boundaries of the City of Duluth. Compl. ¶ 9. At this time, the Band did not have reservation lands within the City, but did operate a bingo parlor on its reservation located west of Cloquet, Minnesota. *Id.* With the City's assistance, the Band acquired land in downtown Duluth, had it placed into trust for the tribe, and had it declared part of the Band's reservation by the Secretary of the Interior. *Id.* ¶ 10.

In 1986, the City and the Band entered into a series of agreements ("the 1986 Contracts"), to, among other things, create an economic development entity known as the Duluth-Fond du Lac Economic Development Commission, and to develop a casino gaming facility on the Band's property in downtown Duluth ("the Casino"). *Id.* ¶ 12. Under the 1986 Agreements, the Commission was given the authority to operate gaming within the Band's Casino, with the revenues from the Casino to be split among the Band, the City, and the Commission. *Id.* ¶ 13. The Secretary of the Interior approved the 1986 Contracts, and in September 1986 the Casino opened for business.

In 1988, Congress passed the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.* Upon the passage of IGRA, the Band sued the City in federal court arguing that the 1986 Contracts violated IGRA. Compl. ¶ 15; *see Fond du Lac Band v. City of Duluth, et al.*, No. 5:89-cv-163 (D.Minn. July 31, 1989). On December 26, 1990, the United States District Court for the District of Minnesota dismissed the case without prejudice and referred the parties to the National Indian Gaming Commission ("NIGC") for a report and recommendation. Compl. ¶ 16. Following this Order, the Band filed a petition with the NIGC seeking review of the legality of the 1986 Contracts in light of the subsequent enactment of IGRA. *Id.* ¶ 17. On September 24,

1993, the NIGC issued a determination that the operation of the Casino under the 1986 Agreements violated IGRA, but deferred commencement of any enforcement action in order to allow for mediation. *Id.* ¶ 18.

With the assistance of the NIGC, the City and the Band ultimately reached a revised agreement (the "1994 Contracts") that restructured the ownership and control of the gaming operation of the Casino. *Id.* ¶ 19-20. The 1994 Contracts created a sublease and assignment of gaming rights agreement, under which the Band sublet the Casino from the Commission, took control of the operation and regulation of all gaming at the Casino, and allegedly obtained sole proprietary interest in the Casino gaming operations as well as all ancillary businesses conducted in the Casino. *Id.* ¶ 21-22. Under this sublease, the Band agreed to pay rent to the City of 19% of the gross revenues from video games of chance at the Casino until the initial expiration date of the sublease. *Id.* ¶ 22. The sublease had an initial expiration date of March 31, 2011, with an extension term running through March 31, 2036. *Id.* The amount of rent for the extension term was left undetermined, with the sublease requiring that the City and the Band meet and negotiate the rent for the extension term on or before January 1, 2010, and in the absence of an agreement, submit the issue to arbitration. *Id.*

The City and the Band submitted the 1994 Contracts to the NIGC for review and approval and the NIGC determined that the 1994 Contracts fully complied with IGRA. *Id.* ¶ 23. Following this NIGC approval, the City and the Band entered into and filed with the United States District Court for the District of Minnesota a Stipulation and Consent Order. Under this Stipulation, the parties filed a Consent Decree with the court seeking approval of a Settlement Agreement consisting of the 1994 Contracts. *Id.* ¶ 24; *see Fond du Lac Band of Lake Superior Chippewa Indians v. City of Duluth*, No. 5:94-cv-82 (D.Minn. June 22, 1994). In this

Stipulation, the Band and the City agreed that the 1994 Contracts gave the Band sole proprietary interest in the gaming operations. Compl. ¶ 25. In a separate Report and Recommendation to the Minnesota District Court dated June 20, 1994, the NIGC Chairman advised the court of its approval of the 1994 Contracts and informed the court that the agreements were "fully consistent with the IGRA." *Id.* ¶ 27. The 1994 Contracts have not been subsequently modified. *Id.* ¶ 28.

Fourteen years later, in January 2009, the Band notified the City that it believed that it had overpaid rent under the terms of the sublease, and advised the City that the overpayment included the entire period of the sublease from its execution in 1994 through the third quarter of 2008. *Id.* ¶ 29. The Band further informed the City that the Band would be withholding all future rent payments under the sublease due to this alleged past overpayment of rent. *Id.* The City disagreed with this assessment and demanded payment of the withheld rent. *Id.* ¶ 30. On or about August 6, 2009, the Band, through its Reservation Business Committee, passed Resolution No. 1316/09 under which it immediately ceased all payments to the City pursuant to the 1994 Contracts. *Id.* ¶ 31.

In response to the Band's actions, the City brought suit seeking to enforce the Consent Decree incorporating the 1994 Contracts in the United States District Court for the District of Minnesota. *Id.* ¶ 32; *see City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, No. 09-cv-2668 (D.Minn. Sept. 29, 2009). On April 21, 2010, the District Court granted the City's motion for summary judgment as to liability, concluding that the Band had failed to demonstrate a change in the law justifying the Band's action. *See City of Duluth v. Fond du Lac Band of Lake Superior Chippewa,* 708 F.Supp.2d 890 (D.Minn. 2010). The court ruled that the Band's argument about the legality of the consent decree was barred by res judicata because the decree had been approved by the court and formalized in a judgment. *Id.* at 898. The court denied

dispositive relief as to the amount of damages and held that the issue of the appropriate accounting method for the rent determination under the sublease was to be tried. *Id.* at 902-03.

Subsequently, in an August 16, 2010 letter to the NIGC, the Band requested that the NIGC reexamine the 1994 Contracts and make a limited order prohibiting the Band from making further payments to the City, but otherwise allowing for the continued operation of the Casino. Compl. ¶ 34. Via letter dated October 20, 2010, NIGC Chairwoman Tracie L. Stevens notified the Band and the City that it was reviewing the 1994 Contracts as requested by the Band. *Id.* ¶ 35. Both the City and the Band participated in and submitted briefs to the NIGC's Enforcement Division. *Id.* On May 13, 2011, the Minnesota District Court denied the Band's motion for a continuance pending the completion of the NIGC's review, and ordered the Band and the City to submit to binding arbitration on the issue of the amount of rent for the twenty-five year extension term of the 1994 Contracts. *See City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 09-cv-2668 (D.Minn. May 31, 2011), ECF No. 179. An arbitration hearing between the Band and the City commenced and the City completed presentation of its case-in-chief on July 12, 2011. Compl. ¶ 38.

On July 12, 2011, the NIGC issued NOV-11-02 ("Notice of Violation" or "NOV"). In this Notice of Violation, the NIGC concluded that the 1994 Contracts violated IGRA's mandate that the Band retain "sole proprietary interest" in and "responsibility for" its gaming activity. Compl. ¶ 38. The Band was ordered to cease performance under the 1994 Contracts "of those provisions identified in [the] NOV as violating IGRA." *Id.* The Band did not appeal the NOV. *Id.* ¶ 40. However, on July 21, 2011, the City filed a petition with the NIGC seeking to intervene in order to perfect an appeal of the NOV. *Id.* ¶ 41. The NIGC rejected this petition on the

grounds that the City was not a respondent to the NOV and thus could not initiate an appeal before the NIGC.  *Id.*

The Band took several actions in response to the NOV.  On July 19, 2011, the Band, through its Reservation Business Committee passed Resolution No. 1242/11 which, among other things, (1) adopted the NIGC's interpretation of IGRA's sole proprietary interest provision set forth in the NOV and (2) ceased all activities under the 1994 Contracts that could result in the imposition of sanctions under the NOV.  *Id.* ¶ 42.  Further, on July 22, 2011, the Band filed a motion for relief from the Consent Decree under Fed. R. Civ. P. 60(b).  In response to this filing, on November 21, 2011, the Minnesota District Court issued an order granting the Band's motion for relief under Rule 60(b), insofar as it requested that the Band be relieved of any further compliance with its obligations under the 1994 Contracts.  *City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 830 F.Supp.2d 712, 726 (D.Minn. 2011).  However, the court denied the Band's motion insofar as it requested retroactive relief, including (1) relief from payments due the City for the years 2009-2011, and (2) the right to pursue its counterclaims seeking refund of all rent already paid to the City prior to 2009.  *Id.* at 726-728.

Both the Band and the City appealed the District Court's Rule 60(b) Order to the United States Court of Appeals for the Eighth Circuit.  On January 14, 2013, the Eighth Circuit issued an opinion affirming the District Court's ruling relieving the Band from prospective compliance, but reversing and remanding the Court's denial of retrospective relief for further consideration.  *See City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 702 F.3d 1147, 1156 (8th Cir. 2013).  On October 8, 2013, the United States District Court for the District of Minnesota issued its order on remand, which affirmed its earlier denial of retrospective relief to the Tribe.

*See City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, No. 09-cv-2668, 2013 WL 5566172, at *11 (D. Minn. Oct. 8, 2013).

As of the date of the Complaint, the Band continues to operate the Casino. Compl. ¶ 48.

## B. Procedural History

On February 26, 2013, the City filed suit against Defendants in this Court. Plaintiff argues that Defendants' decision to issue the NOV was arbitrary, capricious, or otherwise not in accordance with the law in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706, as no change of law occurred between the NIGC's approval of the 1994 Contracts and the July 12, 2011 issuance of the NOV. Compl. ¶¶ 55-56. Further, Plaintiff argues that the NOV exceeds the NIGC's statutory and regulatory authority, as it conflicts with a judgment of the United States District Court for the District of Minnesota approving the 1994 Contracts. *Id.* ¶ 59. Accordingly, Plaintiff requests that the Court issue a declaratory judgment that the actions of the Defendants are arbitrary, capricious, or otherwise not in accordance with law, and set aside the NOV. *Id.* ¶ 61. Plaintiff also requests additional relief including a reversal of the NOV as well as an order that Defendants take all necessary corrective action to reinstate the preexisting legal rights of the City. *Id.* ¶ 63 *et seq.*

In response to this Complaint, Defendants filed their [8] Motion to Dismiss, contending that Plaintiff lacks jurisdiction over this Complaint because Plaintiff lacks both Article III standing and prudential standing.

## II. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject matter jurisdiction over its claim. *Moms Against Mercury v. FDA*, 483 F.3d 824, 828 (D.C. Cir. 2007). In determining whether there is jurisdiction, the

Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted). "At the motion to dismiss stage, counseled complaints, as well as *pro se* complaints, are to be construed with sufficient liberality to afford all possible inferences favorable to the pleader on allegations of fact." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005). "Although a court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1)," the factual allegations in the complaint "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Wright v. Foreign Serv. Grievance Bd.*, 503 F.Supp.2d 163, 170 (D.D.C. 2007) (citations omitted).

### III. DISCUSSION

#### A. Article III Standing

"To satisfy the requirements of Article III standing in a case challenging government action, a party must allege an injury in fact that is fairly traceable to the challenged government action, and 'it must be likely, as opposed to merely speculative, that the injury will be 'redressed by a favorable decision.'" *National Wrestling Coaches Ass'n. v. Department of Education*, 366 F.3d 930, 937 (D.C. Cir. 2004) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted)). It is axiomatic that the "party invoking federal jurisdiction bears the burden of establishing these elements" of constitutional standing. *Lujan*, 504 U.S. at 561.

Here, Defendants argue that Plaintiff fails to meet the second and third elements required for Article III standing: causation and redressability. Defs.' MTD at 9-12. In order to assess these two elements, the Court must first establish (1) the City's claimed injury, and (2) the

challenged government action. First, the City's claimed injury is the loss of rights accorded it under the Consent Decree and 1994 Contracts. Pl.'s Opp'n at 6. Although the City does not specify, as it submitted its filing prior to the most recent decision of the Minnesota District Court, the Court understands these to consist primarily of the loss of rents due under the extension term of the 1994 Contracts which was set to begin in 2011. *Id.* The city cannot be claiming injury from the loss of rents under the initial term of the contract, as the Minnesota District Court has denied the Band retrospective relief for rents paid prior to 2009 and required it to pay rent for the 2009 to 2011 period up to the conclusion of the initial term of the 1994 Contracts. *See City of Duluth*, 2013 WL 5566172, at *5 & n.4. Second, the challenged government conduct here is the issuance of the NOV by Defendants. Pl.'s Opp'n at 6.

In challenging Plaintiff's Article III standing, Defendants argue that Plaintiff cannot show (1) a sufficient causal link between the NOV and the loss of the post-2011 rent payments, or (2) that a favorable ruling with respect to the NOV would redress Plaintiff's loss of the benefits of the agreement. Defs.' MTD at 9-12. As Defendants point out, causation and redressability in this case hinge on the actions of a third-party not before the Court, the Band. *Id.* at 10. The Band, and not the City, was the party regulated by the NIGC and directly affected by the NOV. And since the independent actions of the Band caused the injury complained of by Plaintiff – the loss of the benefits provided for in the 1994 Contracts – Defendants question the causal link between the injury and the challenged government conduct.

"When the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)). As the Supreme Court noted in *Lujan*, when "a plaintiff's asserted injury arises from the government's

allegedly unlawful regulation (or lack of regulation) of *someone else* . . . causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Id.* (emphasis in original). Accordingly, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* "[M]ere 'unadorned speculation' as to the existence of a relationship between the challenged government action and the third-party conduct 'will not suffice to invoke the federal judicial power.'" *National Wrestling Coaches*, 366 F.3d at 938 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976)).

Yet despite this higher standard, "courts occasionally find the elements of standing to be satisfied in cases challenging government action on the basis of third-party conduct." *National Wrestling Coaches*, 366 F.3d at 940. As the D.C. Circuit has observed, "mere indirectness of causation is no barrier to standing, and thus, an injury worked on one party by another through a third party intermediary may suffice." *Tel. & Data Sys., Inc. v. FCC*, 19 F.3d 42, 47 (D.C. Cir. 1994) (quoting *National Wildlife Fed'n v. Hodel*, 839 F.2d 694, 705 (D.C. Cir. 1988)). In applying this standard, the D.C. Circuit has identified categories of cases where standing to challenge government action may be found despite the involvement of third parties in the chain of causation. *See National Wrestling Coaches*, 366 F.3d at 940.

The set of these cases most relevant here revolve around the "narrow proposition" that "injurious private conduct is fairly traceable to the administrative action contested in the suit if that action authorized the conduct or established its legality." *Tel. & Data Sys.*, 19 F.3d at 47. Accordingly, "[w]hen an agency order permits a third-party to engage in conduct that allegedly injures a person, the person has satisfied the causation aspect of the standing analysis."

*Consumer Federation of America v. FCC*, 348 F.3d 1009, 1012 (D.C. Cir. 2003). *See also America's Cmty. Bankers v. FDIC*, 200 F.3d 822, 827-28 (D.C. Cir. 2000); *Animal Legal Def. Fund v. Glickman*, 154 F.3d 426, 440-43 (D.C. Cir. 1998) (*en banc*). "Causation and redressability thus are satisfied in this category of cases, because the intervening choices of third parties are not truly independent of government policy." *National Wrestling Coaches*, 366 F.3d at 940-41.[3]

The Court concludes that Plaintiff's claim fits within this line of precedent. Accordingly, standing exists here despite the fact that Plaintiff is challenging government action on the basis of intervening third-party conduct. As the D.C. Circuit has noted, "injurious private conduct is fairly traceable to the administrative action contested in the suit if that action authorized the conduct or established its legality." *Tel. & Data Sys.*, 19 F.3d at 47. Here, that is plainly the case. In the absence of the NOV, the Band was faced with an order from the Minnesota District

---

[3] Another set of cases has found standing despite the actions of an intervening third party "where the record presented substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." *National Wrestling Coaches*, 366 F.3d at 941. *See Tozzi v. United States Dep't of Health & Human Svcs.*, 271 F.3d 301, 307-10 (D.C. Cir. 2001); *Block v. Meese*, 793 F.2d 1303, 1308 (D.C. Cir. 1986). These cases require "formidable evidence" of causation, *see Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 418 (D.C. Cir. 1994), in order to allow a court to easily discern whether standing exists. The Court notes that these cases also suggest standing exists here, as Plaintiff has alleged facts showing that the Band's actions in response to the NOV were never in doubt. First, the Band only sought the NIGC's evaluation of the 1994 Contracts *after* the City had brought suit to enforce the Consent Decree, and *after* the Minnesota District Court had issued an order requiring the Band to abide by the terms of the 1994 Contracts. *See* Compl. ¶ 34. Moreover, according to Plaintiff's allegations, "by letter dated August 16, 2010, the Band requested that the NIGC reexamine the 1994 Contracts and make a limited order prohibiting the Band from making further payments to the City, but otherwise allowing for the continued operation of the Casino." *Id.* These allegations, if ultimately substantiated, could show that it was "not at all speculative", *Tozzi*, 271 F.3d at 308 (internal quotation marks omitted), that the Band would take the actions it ultimately took in response to the NOV. However, because the Court concludes that Plaintiff has established causation under an alternative line of precedent, it need not address whether Plaintiff has put forth sufficient evidence at the motion to dismiss stage to establish standing under this line of precedent as well.

Court enforcing the 1994 Contracts and requiring the Band to submit to arbitration to determine the terms of the 2011-2036 extension of the 1994 Contracts. *See City of Duluth*, 708 F.Supp.2d 890; *id.,* 09-cv-2668 (D.Minn. May 31, 2011), ECF No. 179. The NOV, declaring that the provision requiring payment of rent to the City violated IGRA, provided the basis for the Band to seek reconsideration of the Minnesota District Court's decision, withdraw from the 1994 Contracts while continuing to engage in gaming, and ultimately cause the injury Plaintiff complains of in this Court. Indeed, if there was any doubt that the administrative action at issue here established the legality of the Band's actions, both the Minnesota District Court and the Eighth Circuit recognized the NOV as a *change in the law* justifying the Band's actions. *See City of Duluth*, 702 F.3d at 1152 ("Here, the district court decided that the NIGC's determination that terms of the consent decree violated IGRA was a *change in law* that required modification of the decree to eliminate its prospective application from 2011 to 2036.") (emphasis added); *id.* at 1153 ("We agree with the district court that a binding adjudication by a federal agency, which has been tasked with interpreting and enforcing a statute enacted by Congress, represents a *change in law* for the purposes of Rule 60(b).") (emphasis added); *City of Duluth*, 830 F.Supp.2d at 722 ("The Court finds that this change in agency position or interpretation constitutes a *change in the law* that could warrant relief under Rule 60(b)(5).") (emphasis added). Accordingly, based on the facts alleged by Plaintiff, the Court concludes that the administrative action at issue authorized the conduct that allegedly injured Plaintiff, which is sufficient to establish causation.

To be sure, as Defendants note, the NOV did not *mandate* the course of action taken by the Band. Defs.' Reply at 3. The Band was free to take other actions in response to the NOV, including ceasing gaming entirely (as it was permitted to do under the contract). *Id.* But the

crucial fact here is that the NOV established the legality of the course of conduct the Band *did take*. But for the NOV, the City would have been entitled to enforcement of the 1994 Contracts and Consent Decree in the manner determined by the Minnesota District Court prior to the NIGC's decision. *See City of Duluth*, 708 F.Supp.2d 890. Once issued, however, the NOV provided the Band the legal authority to inflict the injury complained of by Plaintiff. And as the D.C. Circuit has stated, "[w]hen an agency order permits a third-party to engage in conduct that allegedly injures a person, the person has satisfied the causation aspect of the standing analysis." *Consumer Fed. of Am.*, 348 F.3d at 1012. Importantly, the court in *Consumer Federation of America* used the word *permit*, meaning that causation does not demand that the agency action *mandate* the allegedly injurious conduct. *Id.*

In arguing that Plaintiff lacks standing here, Defendants focus primarily on the D.C. Circuit's opinion in *Microwave Acquisition Corp. v. FCC*, 145 F.3d 1410 (D.C. Cir. 1998). However, that case is factually distinct from Plaintiff's claim. The case of *Microwave Acquisition Corp.* involved the FCC's regulatory approval of the transfer of Qwest Communications from MCI to Southern Pacific Telecommunications. *Id.* at 1411-12. Microwave Acquisition Corporation ("MAC"), the appellant, alleged that it had an enforceable contract with MCI to purchase Qwest, and sought review of the FCC's transfer approval order for the rival contract. *Id.* The D.C. Circuit agreed with the FCC and concluded that MAC lacked standing because its asserted injury – the loss of its contractual right to acquire Qwest – met "neither the traceability nor the redressability requirement for standing." *Id.* at 1412. The court concluded that "MAC's loss of Qwest is . . . attributable not to any action of the Commission but to MCI's alleged breach of its contract to sell Qwest to MAC. The transfer proceeding could not have caused the alleged breach which occurred before the transfer application was ever filed and

*would have continued whatever the Commission's decision*." *Id.* (emphasis added). Here, by contrast, there is a greater causal link between the alleged breach and the administrative action at issue. Indeed, the breach at issue would *not* have continued in the absence of the NOV. As discussed, the issuance of the NOV represented a legal change which authorized the Band to do that which it had previously been ordered not to do by the Minnesota District Court. But for the NOV, the Band would not have been able to assert a successful Rule 60(b) motion and the City and the Band would have engaged in Court-ordered arbitration on the extension term of the agreement. Accordingly, in the absence of the NOV, the alleged breach of the 1994 Contracts would have been resolved by the orders of the Minnesota District Court. Indeed, *Microwave Acquisition Corp.* actually recognized the basis of the Court's opinion here, noting that the Commission's action did not "authorize the alleged injury", in contrast to other cases where the D.C. Circuit has found standing. 145 F.3d 1412 n.3 (citing *Tel. & Data Sys., Inc.*, 19 F.3d at 47). The case explicitly recognized the "narrow proposition" applicable here, under which "injurious private conduct is fairly traceable to the administrative action contested in the suit if that action authorized the conduct or established its legality." *Id.* (quoting *Tel. & Data Sys., Inc.*, 19 F.3d at 47).

Defendants' remaining arguments for lack of causation are unpersuasive. Defendants first focus on the fact that the alleged breach of the contract occurred in 2009, two years before the issuance of the NOV, suggesting that Plaintiff's injury predates the NOV. Defs.' MTD at 11. Yet, in light of the judgment of the Minnesota District Court requiring the Band to pay withheld rent to the city for the initial term of the contract ending in 2011, *see City of Duluth*, 2013 WL 5566172 at *11, the lost rents from 2009 to 2011 do not constitute part of Plaintiff's current injury. Plaintiff has established, however, that its remaining injury – the post-2011 rents to

which it believes it is entitled – are causally related to the administrative action at issue, forming the basis for its standing in this Court. Next, Defendants argue that the Band's breach could have continued regardless of the NIGC's decision to issue the NOV. Defs.' MTD at 11. However, this is plainly untrue. Prior to the issuance of the NOV, the Minnesota District Court had rejected the Band's challenge to the validity of the 1994 Contracts and ordered the City and the Band to enter into arbitration to set a rate for the extension term of the contract. *See City of Duluth*, 708 F.Supp.2d 890; *id.* 09-cv-2668 (D.Minn. May 31, 2011), ECF No. 179. The Band could not have continued in its breach of the 1994 Contracts without running afoul of this court order.

Defendants' arguments for a lack of redressability are similarly unavailing. "To survive a motion to dismiss, a plaintiff 'must allege facts from which it reasonably could be inferred that, absent the [challenged policy], there is a substantial probability that . . . if the court affords the relief requested, the asserted [injury] will be removed." *National Wrestling Coaches*, 366 F.3d at 944 (quoting *Warth v. Seldin*, 422 U.S. 490, 504 (1975)). "A claim is justiciable 'so long as the relief sought would constitute a necessary first step on a path that could ultimately lead to relief fully redressing the injury.'" *American Petroleum Tankers Parent, LLC v. United States*, 943 F.Supp.2d 59, 66 (D.D.C. 2013) (quoting *Tel. & Data Sys., Inc.*, 19 F.3d at 47).

With respect to the relief sought by Plaintiff, the Administrative Procedure Act states that a court "shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A). "[T]he Supreme Court and the D.C. Circuit have held that vacatur is the presumptive remedy for this type of violation." *In re Polar Bear Endangered Species Act Listing and § 4(d) Rule Litigation*, 818 F.Supp.2d 214, 238 (D.D.C. 2011). *See also Federal Election Comm'n v. Akins*, 524 U.S.

11, 25 (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case."); *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) ("If an appellant has standing . . . and prevails on its APA claim, it is entitled to relief under that statute, which normally will be vacatur of the agency's order.").[4]

Here, a decision by this Court vacating and remanding the NOV to the NIGC constitutes a necessary first step toward redressing Plaintiff's injury. The NOV formed the basis of the Minnesota District Court and the Eighth Circuit's conclusion that Plaintiff was no longer entitled to payments under the contract. *City of Duluth*, 702 F.3d at 1153 ("We agree with the district court that a binding adjudication by a federal agency, which has been tasked with interpreting and enforcing a statute enacted by Congress, represents a change in law for the purposes of Rule 60(b)."). If the NIGC's decision as to the NOV is ultimately reversed or withdrawn on remand from this Court, Plaintiff could once again seek to enforce the 1994 Contracts. Pl.'s Opp'n at 16. Indeed, the Eighth Circuit so much as set out this course for Plaintiff, noting that the City should raise its challenge to the NOV not before Minnesota federal courts, but rather in an APA action in this Court. *See City of Duluth*, 702 F.3d at 1153 ("While the City may question the validity of the NIGC's current position, such challenges are properly made under the Administrative Procedure Act (APA). The NIGC is not a party to this litigation, and the City has not made a showing that the review process established by Congress in the APA might be circumvented here.") (citations omitted). In light of the Eighth Circuit's instructions, Plaintiff states in its brief

_____

[4] Plaintiff also seeks additional relief from this Court, including a reversal of the NOV as well as an order that Defendants take all necessary corrective action to reinstate the preexisting legal rights of the City. The Court notes its skepticism regarding its power to issue this relief, as the APA appears to authorize injunctive relief only for "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). However, because Plaintiff has also requested relief within the power of this Court to grant that would appear to redress its injury, the Court takes no position at this time whether the Court has the power to grant these other forms of relief sought by Plaintiff, as this question is not currently at issue.

that if it prevails in this action and the NOV is ultimately reversed, such a reversal will provide a basis for the City to return to the Minnesota District Court and assert its own Rule 60(b) motion to reinstate the Consent Decree and the 1994 Contracts. Pl.'s Opp'n at 16. To be sure, the Court cannot know whether this motion would ultimately succeed. However, this does not mean Plaintiff lacks standing. As this Court has noted, "[t]he Plaintiff may not ultimately prevail if the Court vacates the Administrator's decision, but it 'cannot prevail unless [the Court] do[es] so,' which is sufficient to satisfy the redressability requirement for constitutional standing." *American Petroleum Tankers Parent, LLC v. United States*, 943 F.Supp.2d 59, 66 (D.D.C. 2013) (quoting *Power Co. of Am., L.P. v. Fed. Energy Regulatory Comm'n*, 245 F.3d 839, 842 (D.C. Cir. 2001)).

In arguing for a lack of redressability, Defendants contend that even if the NIGC chose not to issue another NOV on remand, the Band would still have the option to cease gaming entirely or to renegotiate the agreements. Defs.' Reply at 8. Under this view, if the Band chose to cease gaming entirely (as it would be entitled to do under the contract), this Court's ruling would not redress Plaintiff's injury. But this argument ignores the scope of Plaintiff's claimed injury and the details of the Minnesota District Court's holdings. To be sure, the City is seeking to regain the benefits of the 1994 Contracts prospectively. However, the City is *also* seeking the rent payments owed under the 1994 Contracts. This includes the payments from the time of the end of the initial term of the contracts until the present. Pl.'s Opp'n at 6. The Minnesota District Court ruled, and the Eighth Circuit affirmed, that the City is not entitled to rent under the extension term due to the change in the law created by the NOV. *See City of Duluth*, 702 F.3d at 1152 ("Here, the district court decided that the NIGC's 2011 determination that terms of the consent decree violated IGRA was a change in the law that required modification of the decree to

eliminate its prospective application from 2011 to 2036"). Even if at some future date the Band ceased gaming entirely in response to the withdrawal or reversal of the NOV on remand, the City would *still* be deprived of these payments from 2011 until the present. Furthermore, the withdrawal or reversal of the NOV would provide the City grounds to seek these payments through a motion for reconsideration in the Minnesota District Court. In light of this component of Plaintiff's injury, which would not be affected by any ultimate decision by the Band to cease gaming, the Court concludes that Plaintiff's injury is surely redressable by a favorable ruling from this Court.

### B. Prudential Standing

Yet the Court's conclusion that Plaintiff has standing under Article III does not fully resolve Defendants' motion. "[C]onstitutional standing is not the end of the game because the 'question of standing involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *National Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1278 (D.C. Cir. 2005) (quoting *Bennett v. Spear*, 520 U.S. 154, 162 (1996)). With respect to prudential limits on standing, the Supreme Court has "long held that a person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S.Ct. 2199, 2210 (2012) (quoting *Assoc. of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970)). Here, Defendants contend that Plaintiff's claims fall outside the zone of interests. Defs.' MTD at 13-19.

In its most recent discussion of the zone of interests test, the Supreme Court made clear that the requirement is a very low hurdle for APA plaintiffs. "The prudential standing test . . .

'is not meant to be especially demanding.'" *Patchak*, 132 S.Ct. at 2210 (quoting *Clarke v. Securities Industry Assn.*, 479 U.S. 388, 399 (1987)). *See also Amador County v. Salazar*, 640 F.3d 373, 379 (D.C. Cir. 2011) (noting "the oft-repeated rule that the zone-of-interests test is not especially demanding.") (internal citations and quotation marks omitted); 3 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 16.9, at 1521 (5th ed. 2010) ("An injured plaintiff has standing under the APA unless Congress intended to preclude judicial review at the behest of parties in plaintiff's class."). In enforcing this lenient requirement, a court must "apply the test in keeping with Congress' 'evident intent' when enacting the APA 'to make agency action presumptively reviewable.'" *Patchak*, 132 S.Ct. at 2210 (quoting *Clarke*, 479 U.S. at 399). "We do not require any 'indication of congressional purpose to benefit the would-be plaintiff." *Id.* (quoting *Clarke*, 479 U.S. at 399-400). Furthermore, the Court noted that it "ha[s] always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff." *Id.* In general, "[t]he test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* (quoting *Clarke*, 479 U.S. at 399).

In arguing that Plaintiff lacks prudential standing under the zone of interests test, Defendant focuses on the fact that the City is not an entity regulated by the NIGC or an intended beneficiary of IGRA. Defs.' MTD at 13-17. Absent these facts, Defendants contend that under D.C. Circuit precedent, *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 922-24 (D.C. Cir. 1989), the city must show it is a "suitable challenger" to the NIGC's implementation of the sole proprietary interest requirement contained in § 2710(b)(2)(A). Defs.' MTD at 13. The Court notes that in applying this "suitable challenger" standard, the D.C. Circuit has utilized

exactly the lenient test for the zone of interests requirement most recently set out by the Supreme Court in *Patchak*. For example, in *Scheduled Airlines Traffic Offices, Inc. v. Department of Defense*, the D.C. Circuit noted that a non-regulated party who is not an intended beneficiary of a provision "may nonetheless have standing if it is a 'suitable challenger[ ] to enforce' the statute." 87 F.3d 1356, 1360 (D.C. Cir. 1996) (quoting *First Nat'l Bank & Trust Co. v. National Credit Union Admin.*, 988 F.2d 1272, 1276 (D.C. Cir. 1993)). After emphasizing that "this 'test is not meant to be especially demanding,'" the D.C. Circuit made clear, just as the Supreme Court stated in *Patchak,* that "a would-be plaintiff is outside the statute's 'zone of interests' only 'if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* (quoting *Clarke*, 479 U.S. at 399).

Here, Defendants argue that Plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in IGRA's sole proprietary interest and responsibility requirement that the City falls outside the zone of interests. Defs.' MTD at 17-18. Pursuant to 25 U.S.C. § 2710(b)(2)(A), "[t]he Chairman shall approve any tribal ordinance or resolution concerning the conduct, or regulation of Class II gaming on the Indian lands within the Tribe's jurisdiction if such ordinance or resolution provides that – (A) . . . the Indian tribe will have the sole proprietary interest and responsibility for the conduct of any gaming activity." Defendants contend that in seeking vacatur of the NOV and preservation of its contractual rights under the 1994 Contracts, "[t]he City has absolutely no interest in the Band being the 'primary beneficiary' of the gaming operation or in the Band being the 'sole proprietor.' Rather, the City is interested in being a joint beneficiary and joint proprietor of the casino." Defs.' MTD at 18. Accordingly, because its interest is inconsistent with preserving the Band as the "primary beneficiary" of the

gaming operation, the City's interest is inconsistent with the purposes of the provision. *Id.*

Under this view, Defendants contend, the City is not a suitable challenger and should be denied

prudential standing.

However, the Supreme Court rejected a similar argument against prudential standing in

*Patchak.* In that case, a landowner brought an APA challenge to the Secretary of Interior's

decision to acquire a parcel of property neighboring his own "for the purpose of providing land

for Indians" under 25 U.S.C. § 465. *Patchak*, 132 S.Ct. at 2210. Applying the lenient test for

prudential standing set out above, the Court concluded that the landowner plaintiff fell within the

zone of interests to be protected or regulated by the statute. *Id.* at 2210-12. In reaching this

conclusion, the Court rejected arguments that this plaintiff lacked prudential standing because he

was "not an Indian or tribal official seeking land" or did not "claim an interest in advancing

tribal development." *Id.* at 2210 n.7. "The question is not whether § 465 seeks to benefit

[plaintiff]; everyone can agree it does not. The question is instead . . . whether issues of land use

(arguably) fall within § 465's scope—because if they do, a neighbor complaining about such use

may sue to enforce the statute's limits." *Id.*

So too here, the relevant issue is not whether the "sole proprietary interest" requirement

in § 2710(b)(2)(A) was intended to benefit Plaintiff or whether Plaintiff seeks to advance the

Band's interest. Rather, the question is whether the issues raised by Plaintiff fall within the

scope of the provision. Clearly they do. It seems obvious that when considering whether a tribe

"possess[es] the sole proprietary interest in and responsibility for the gaming activity and [is] the

primary beneficiary of that activity," 25 U.S.C. § 2710(b)(2)(A), that the proprietary interests of

another in the gaming operation (the interest Plaintiff seeks to protect here) is a relevant

consideration. Indeed, revealing the extent to which the interests of the City fall within the scope

of this provision, the NOV explicitly considered the extent of the City's contractual rights, noting that the agreements "grant the City of Duluth, Minnesota (the 'City') an unlawful proprietary interest in the Band's gaming activity and prevent the Band from possessing the sole responsibility for the gaming activity." Defs.' MTD, Ex. 1 (NIGC Notice of Violation), at 1. Moreover, the NIGC actually solicited the City's views on this issue, *id.* at 6, providing further evidence that the interests asserted by Plaintiff in the protection of its contractual rights are hardly some marginal issue to the "sole proprietary interest" requirement and the NOV issued for violation of this requirement. In *Patchak*, the Court reached a similar conclusion in finding prudential standing, noting that "when the Secretary obtains land for Indians under § 465, she does not do so in a vacuum. Rather, she takes title to properties with at least one eye directed toward how tribes will use those lands to support economic development." 132 S.Ct. at 2211. This consideration of land use as part of the Secretary's determination under § 465 provided the landowner plaintiff in *Patchak* prudential standing on the basis of his interests relating to land use. *Id.* Similarly, here, in making its determination to issue the NOV, the NIGC necessarily considered the ownership interests of other parties in the gaming operation and whether they were too great to raise concerns under § 2710(b)(2)(A).

In concluding that Plaintiff falls within the zone of interests to be protected or regulated by § 2710(b)(2)(A), the Court is cognizant of the fact that in assessing prudential standing, "the benefit of any doubt goes to the plaintiff." *Patchak*, 132 S.Ct. at 2210. Here, for the reasons discussed, the Court cannot say that Plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke*, 479 U.S. at 399. Indeed, "[a]s a practical matter it would be very strange to deny [plaintiff] standing in this case. [Its'] stake in opposing the

[NOV] is intense and obvious.  The zone-of-interests test weeds out litigants who lack a sufficient interest in the controversy . . . ."  *Patchak v. Salazar*, 632 F.3d 702, 707 (D.C. Cir. 2011), *aff'd sub nom, Patchak*, 132 S.Ct. 2199.  Plaintiff is "surely not in that category."  *Id.*

For the same reason, Defendants' fears are unfounded that a finding of prudential standing in this case would create standing to challenge an NIGC NOV for *any* contractual counterparty of a tribe.  Defs.' MTD at 19.  Plaintiff represents a particular type of contractual counter-party, one whose interests were explicitly and obviously considered and weighed in reaching the determination to issue the NOV as to the sole proprietary interest requirement. Accordingly, the Court is pointedly *not* granting prudential standing to *any* party disadvantaged by an NOV, because, as the D.C. Circuit has recognized, "a rule the gave [a plaintiff] standing merely because it happened to be disadvantaged by a particular agency would destroy the requirement of prudential standing; any party with constitutional standing could sue." *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277, 283 (D.C. Cir. 1988).

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' [8] Motion to Dismiss.  An appropriate Order accompanies this Memorandum Opinion.


Dated: December 18, 2013


_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge